## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SANDRA MARIE HUCKSTEP,                  :
                                        :
      Plaintiff,                   :     Civil Action No.:   15-0362 (RC)
                                        :
      v.                           :     Re Document No.:   9
                                        :
WASHINGTON METROPOLITAN AREA            :
TRANSIT AUTHORITY,                      :
                                        :
      Defendant.                   :

## MEMORANDUM OPINION

### GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

Plaintiff Sandra Marie Huckstep is a former employee of Defendant Washington
Metropolitan Area Transit Authority ("WMATA"). WMATA terminated Ms. Huckstep
following an accident between a WMATA bus that she was operating and a passenger vehicle.
Ms. Huckstep sued WMATA, alleging that her termination was motivated by gender
discrimination in violation of Title VII of the Civil Rights Act. Because no reasonable jury could
find that WMATA unlawfully discriminated against Ms. Huckstep due to her gender, however,
the Court will grant WMATA's motion for summary judgment.

## II.  FACTUAL & PROCEDURAL BACKGROUND

### A.  Ms. Huckstep's Employment with WMATA

Defendant WMATA provides transit services in the Washington, D.C. metropolitan area.
*See* Compl. ¶ 2, ECF No. 1. WMATA hired Ms. Huckstep as a Bus Operator Trainee on October
15, 2013, and she completed bus operator training on December 15, 2013, as part of a trainee

class of thirty-five individuals. *See* Def.'s Statement of Material Facts Not in Dispute ¶¶ 1–3, ECF No. 9-13 [hereinafter "Def.'s SOMF"]; Pl.'s List of Genuine Issues ¶ 1, ECF No. 10-1 [hereinafter "Pl.'s LGI"]; *see also* Student Bus Operator Chart at 1–2, Def.'s Ex. 1, ECF No. 9-2 (listing Ms. Huckstep and her fellow training class members). WMATA then hired Ms. Huckstep as a permanent bus operator and assigned her to the Four Mile Run Bus Garage under the supervision of Jeffrey Thompson. Huckstep Acc. Rep. at 1, Def.'s Ex. 3, ECF No. 9-4 [hereinafter "Huckstep Acc. Rep."]; Def.'s SOMF ¶ 3–4. Upon her assignment, Ms. Huckstep became a member of the Amalgamated Transit Union Local 689 ("Local 689"). Def.'s SOMF ¶ 5.

**B.  WMATA Standard Operating Procedures and Accident Protocol**

As a member of Local 689, Ms. Huckstep is subject to the provisions of the collective bargaining agreement ("CBA") between WMATA and the union. *See* Affidavit of Dolores Proctor ¶ 5 [hereinafter "Proctor Aff."]; Def.'s SOMF ¶ 6; Pl.'s LGI ¶ 1. Section 108 of the CBA governs the "Probationary Period" during which WMATA may take certain actions against new employees. *See* Def.'s SOMF ¶ 6; *see generally* WMATA Probationary Period Policy, Def.'s Ex. 4, ECF No. 9-5. The probationary period lasts for ninety calendar days or forty-five work days, whichever is longer. *See* WMATA Probationary Period Policy at 1. During the probationary period, WMATA may, "at its own discretion, discipline or discharge any new employee, . . . and no grievance may be claimed" by Local 689. *Id*. When a probationary bus driver is involved in an accident, WMATA retains the discretion to terminate the driver. *See* Def.'s SOMF ¶ 7 ("There is no rule that a bus operator is automatically terminated for having any accident within the 90 day probationary period."); Proctor Aff. ¶ 6 ("At all times relevant, there was no rule that states that a new bus operator is subject to automatic termination for having any accident within their 90-day probationary period."); Pl.'s Answers to Interrog. at 2,

ECF No. 10-2 ("For the first 90 days following completion of training, all new WMATA bus

drivers are on probation and any accident may result in immediate termination.").[1]

WMATA employs a set of Standard Operating Procedures ("SOPs") that govern how bus

operators should behave in specific situations. *Cf.* WMATA Guide to Determining Preventable

Accidents, Def.'s Ex. 6, ECF No. 9-7 [hereinafter "Guide to Preventable Acc."] (directing

interviewers to use the Metrobus Standard Operating Procedures when assessing the severity of

accidents). For example, the Defensive Driving SOP directs drivers to "avoid all accidents in

spite of the actions of others or the presence of adverse driving conditions." *See* Huckstep Mem.

of Dismissal at 2, Def.'s Ex. 2, ECF No. 9-3 [hereinafter "Mem. of Dismissal"]. According to the

Intersections SOP, drivers must practice active driving techniques when crossing intersections,

including "mak[ing] complete observations," keeping hands on the wheel at all times, and

scanning the intersection. *Id.* The Operations SOP states that drivers must give themselves

"ample opportunity" to react to changing road conditions. *Id.*

If one of its bus drivers is involved in an accident, WMATA implements a standard

evaluation and disciplinary process. Proctor Aff. ¶ 7; WMATA Disciplinary Policy for

Preventable Accidents at 1, Def.'s Ex. 5, ECF No. 9-6 [hereinafter "Disciplinary Policy"]. After

performing an investigation into the accident, WMATA rates the accident as either

"Non-Preventable" or "Preventable." Disciplinary Policy at 1. Non-Preventable accidents

"occur[] despite every reasonable action by the operator to avoid involvement in an accident." *Id*.

After three Non-Preventable Accidents, an employee must attend one day of training. *Id*. at 2.

---

[1] Although WMATA refers to "Plaintiff's belief . . . that a bus operator is automatically
terminated for having any accident within their 90 day probationary period," Def.'s Mot. Summ.
J. at 1, ECF No. 9, Ms. Huckstep does not appear to advance this argument. *See, e.g.*, Compl. ¶ 9
("Defendant maintains a policy that for the first 90 days following completion of training, . . . any
accident *may* result in immediate termination." (emphasis added)).

Preventable accidents happen "because the employee failed to do everything reasonably expected of a trained professional to avoid involvement in an accident." *Id.* at 1.

If an accident is classified as Preventable, the incident is further classified as either "Preventable–Minor" or "Preventable–Major," which determines the range of possible disciplinary actions. *See id.* at 1–2. WMATA has published an internal memo that assists supervisors in further classifying Preventable accidents.[2] *See generally* Guide to Preventable Acc. The guide lists examples of Preventable–Minor and Preventable–Major accidents for different types of accidents. *Id.* at 3. For example, if another vehicle strikes a Metrobus that is proceeding through an intersection with the right of way, the accident will be rated Preventable–Minor. *Id.* If a Metrobus strikes another vehicle as a result of failure to follow street signs or control its speed, however, the accident will be rated Preventable–Major. *Id.* While WMATA specifies minimum disciplinary actions to be taken against drivers involved in each type of accident, supervisors may take "more severe action based on specific circumstances." Disciplinary Policy at 2; *cf.* WMATA Department of Bus Services Employee's Handbook at 15, Def.'s Ex. 7, ECF No. 9-8 [hereinafter "Employee's Handbook"] (stating that some violations of WMATA policy are "more serious than others and may result in suspension *or even dismissal* upon the first offense" (emphasis added)).

---

[2] The version of the memo in the record is dated after Ms. Huckstep's accident. *Compare* Guide to Preventable Acc. at 1 (listing a date of July 2, 2014), *with* Huckstep Acc. Rep. at 1 (indicating that Ms. Huckstep's accident occurred on January 29, 2014). However, the WMATA Service Director of Bus Transportation attests that the guidelines set forth in the memo were in effect at the time of Ms. Huckstep's accident, *see* Proctor Aff. ¶ 8, and Ms. Huckstep does not dispute this assertion.

### C.  Ms. Huckstep's Accident[3]

On January 29, 2014, during her probationary period, Ms. Huckstep was driving
Metrobus #2519 eastbound on Lee Highway in Virginia. *See* Huckstep Acc. Rep. 2. Video
footage from a camera in the Metrobus showed Ms. Huckstep approaching the intersection of
Lee Highway and Kirkwood Drive, traveling down an incline at a speed of 30 miles per hour.
*See* Mem. of Dismissal at 1; Huckstep Acc. Rep. at 2. As she drove closer to the intersection,
Ms. Huckstep stated that she observed a line of cars on the westbound side of the street waiting
to make a left hand turn across the path of her bus. *See* Huckstep Acc. Rep. at 2. Ms. Huckstep
asserted that the light turned from green to yellow as her bus approached the intersection, but
WMATA concluded during its investigation that she had time to make a safe stop. *See* Mem. of
Dismissal at 1; *cf.* Huckstep Acc. Rep. at 2 (citing Ms. Huckstep's statement that the light was
yellow "by the time [she] got to the stop bar"). Although Ms. Huckstep reacted to the changed
traffic light by initially lowering her speed to 25 miles per hour, she then accelerated to 37 miles
per hour to try to cross the intersection before the light turned red. *See* Mem. of Dismissal at 1.
WMATA found that, as Ms. Huckstep accelerated through the intersection, she did not look left
or right to check for oncoming cars. *See* Huckstep Acc. Rep. at 2.

As Ms. Huckstep's bus crossed the intersection, Brian Mahoney, the driver of one of the
westbound vehicles waiting to turn left, made a left turn in his Ford Explorer and entered the
southbound lane of Kirkwood Drive, crossing the path of Ms. Huckstep's bus. *See id.* at 2, 13–14.

---

[3] Ms. Huckstep does not dispute the facts or circumstances of the accident as set forth by
WMATA, so the Court relies on the description set forth in her accident report, *see* Huckstep
Acc. Rep., and memorandum of dismissal, *see* Mem. of Dismissal. *See* Def.'s SUMF ¶ 12; *see
also* Pl.'s LGI ¶ 1 (not disputed Defendant's statement of fact paragraph 12, which represented
that video of the accident shows Ms. Huckstep accelerated the speed of her bus from 25 to 37
miles per hour before colliding with another vehicle).

Ms. Huckstep says that she determined that she could not make a quick stop without throwing her passengers from their seats and therefore attempted to avoid the accident by swerving, although her accident report states that she "knew some part of his vehicle was going to get hit." *See id.* at 2, 5.

Ms. Huckstep's attempt was unsuccessful. The right front corner bumper of the Metrobus collided with the right rear side and tire of Mr. Mahoney's vehicle. *See id.* at 3, 14. The Metrobus incurred "minor damage" (including damage to the signal light and bumper of the Metrobus) and Mr. Mahoney's vehicle suffered "moderate damage" (including two deployed airbags, flat tires, broken windows, and a bent frame). *See id.* at 3. Mr. Mahoney complained of stomach and back pain, but no other injuries were reported at the scene. *See id.* Arlington County Police responded and cited Mr. Mahoney for "failure to yield the right [of] way"; Ms. Huckstep was not issued a ticket. *See id.* at 3; Pl.'s LGI ¶ 5. Mr. Mahoney's vehicle was towed and Ms. Huckstep was transported for a Post Incident Medical Examination, *see* Huckstep Accident Report at 16, 17–19. WMATA immediately placed her on paid leave pending its investigation. *See id.* at 11.

At the conclusion of the investigation, WMATA rated the accident as Preventable–Major, citing Ms. Huckstep's violation of several Standard Operating Procedures.[4] *See* Mem. of Dismissal at 1; *see also* Huckstep Acc. Rep. at 3–4 (specifying violations of SOPs governing defensive driving, intersection operation, and observations); Def.'s SOMF ¶¶ 11, 12 (describing

---

[4] The first page of Ms. Huckstep's accident report mistakenly classifies the accident as Preventable–Minor. *See* Proctor Aff. ¶ 11. However, the detailed description of the accident contained within the report clearly indicates that WMATA rated the accident "Preventable–Major." *Compare* Huckstep Acc. Rep. at 1 (indicating a Preventable–Minor rating in row 13), *with* Huckstep Acc. Rep. at 3 (stating that "based on all available information . . . [the] accident is rated PREVENTABLE-MAJOR"). Ms. Huckstep does not dispute that her accident was rated Preventable–Major. *See* Pl.'s LGI ¶ 1; Def.'s SOMF ¶ 11.

the accident and stating that Ms. Huckstep violated three SOPs). The investigation found that Ms. Huckstep failed to operate the Metrobus in accordance with the SOPs governing general operations, operations at intersections, and defensive driving. *See* Mem. of Dismissal at 2; Huckstep Acc. Rep. at 3. Based on this finding, WMATA informed Ms. Huckstep that she "failed to meet the high standards of WMATA employees in the area of performance and safety." Def.'s SOMF ¶ 14; *see also* Mem. of Dismissal at 2. Because of "her performance during her probationary period," which included her accident, and the violation of three SOPs during her accident, WMATA terminated Ms. Huckstep's employment on February 11, 2014. Mem. of Dismissal at 2; *see also* Def.'s SOMF ¶ 13.

### D.  Accidents of Other WMATA Drivers

Because the accidents of several comparator WMATA employees feature prominently in Ms. Huckstep's opposition to summary judgment, the Court briefly recounts the circumstances surrounding those accidents.

Dan Davis, Jr. is a male WMATA bus driver based out of the Four Mile Run Garage (the same as Ms. Huckstep) and was a member of Ms. Huckstep's training class. *See* Dan Davis, Jr., Accident Report at 1–2, Def.'s Ex. 9, ECF No. 9-10 [hereinafter "Davis Acc. Rep."]; Def.'s SOMF ¶ 19; Pl.'s LGI ¶ 1. On December 19, 2013, as he was driving westbound on Good Hope Road S.E. just south of 14th Street, Mr. Davis made contact with the mirror of a stopped Circulator bus. *See* Davis Acc. Rep. at 2. Unaware of the accident, Mr. Davis continued driving. *See id.* Mr. Davis returned to the scene after Central Communication contacted him and informed him of the contact with the Circulator bus. *See id.* Both buses sustained minor damage and the police took an accident report, but no charges were filed. *See id.* After an investigation, WMATA rated the accident "Preventable–Minor," citing Mr. Davis' failure to follow SOPs

governing "Observation" and "Passing Parked Vehicles or Fixed Objects." *See id.* at 1–2. WMATA issued Mr. Davis a written reprimand and required him to attend one day of training. *See id.* at 1–3.[5]

On December 30, 2013, Michael Coates, another male WMATA bus driver based out of the Four Mile Run Garage and member of Ms. Huckstep's training class, was driving a bus down Broad Street on a route on which he had not been trained. *See* Michael Coates Accident Report at 3, Def.'s Ex. 8, ECF No. 9-9 [hereinafter "Coates Acc. Rep."]; Def.'s SOMF ¶ 18; Pl.'s LGI ¶ 1. Mr. Coates missed his turn and attempted to turn around. Coates Acc. Rep. at 3. As Mr. Coates was backing up, he "misjudged [his] clearance" and made contact with a lamp pole, knocking it over and causing a minor scratch on the Metrobus. *Id.* Police responded and took a report, although there were no injuries recorded at the scene. *Id.* After an investigation, WMATA rated the accident "Preventable–Minor," citing Mr. Coates's failure to operate the bus in accordance with SOPs relating to "Passing Parked Vehicles or Fixed Objects," "Backing and Parking," and "Observations." *Id.* at 3–4. WMATA issued Mr. Coates a written reprimand and required him to attend one day of paid training. *Id.* at 1, 4. In its accident report, WMATA noted that if Mr. Coates was "involved in another accident while in his [90-day] probation [period]," he would be terminated from employment. *Id.* at 4.

On December 22, 2013, Marc Farmer, a male WMATA bus driver assigned to the Montgomery Bus Division, and also a member of Ms. Huckstep's training class, attempted to

---

[5] Mr. Davis was involved in a separate incident during his probationary period in which he physically struck a patron. *See* Davis Acc. Rep. at 19–26; Def.'s SOMF ¶ 20. He was terminated following that incident. Def.'s SOMF ¶ 20. However, the Court does not consider this accident when evaluating Mr. Davis's status as a comparator because Ms. Huckstep does not offer it as evidence of pretext. *See* Pl.'s LGI ¶ 2 (stating that Mr. Davis's later termination is "irrelevant to any of Plaintiff's claims").

make a U-turn on a side street after inadvertently going off-route. *See* Marc Farmer Accident Report 2, Def.'s Ex. 11, ECF No. 9-12 [hereinafter "Farmer Acc. Rep."]; Def.'s SOMF ¶ 22; Pl.'s LGI ¶ 1. During the attempted U-turn, the Metrobus tore sod on the front lawn of a residence. *See* Farmer Acc. Rep. at 2. The Metrobus sustained no damage and no one was injured. *Id.* Police responded, but no report was taken. *Id.* After an investigation, WMATA rated the accident "Preventable–Minor," directed Mr. Farmer to review SOPs governing "Defensive Driving" and "Making Proper Observations," issued him a written reprimand, and assigned him training. *Id.* at 1–2.

Finally, on January 11, 2014, another member of Ms. Huckstep's training class, Jordan Butler, who was based out of the Bladensburg Bus Division, was driving southbound on Massachusetts Avenue south of E Street. Jordan Butler Accident Report at 2, Def.'s Ex. 10, ECF No. 9-11 [hereinafter "Butler Acc. Rep."]; Def.'s SOMF ¶ 21; Pl.'s LGI ¶ 1. Another Metrobus was servicing the stop that Mr. Butler's bus was to service, so he pulled ahead of the other Metrobus to access the stop. Butler Acc. Rep. at 2. As he attempted to pull into the stop, the right rear window of his bus made contact with the left front mirror of the stopped Metrobus. *Id.* Each bus sustained minor damage, but police were not called to the scene. *Id.* After an investigation, WMATA rated the accident "Preventable–Minor," directed Mr. Butler to review the "Service Stops" SOP, issued him a written reprimand, and assigned him four days of paid training. *Id.* at 1–2.

In sum, Ms. Huckstep offers four comparators, each of whom is male, unlike Ms. Huckstep. During their respective 90-day probationary periods, each putative comparator was involved in an accident that WMATA rated Preventable although, unlike Ms. Huckstep's accident, each of their accidents was rated minor rather than major. And, unlike Ms. Huckstep, none were terminated as a result of their accidents.

### E.  Procedural Background

On July 1, 2014, Ms. Huckstep filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), alleging gender discrimination under Title VII of the Civil Rights Act. Def.'s Mem. Supp. Mot. Summ. J. at 2, ECF No. 9 [hereinafter "Def.'s Mot. Summ. J."]; WMATA Position Statement to the EEOC at 1–5, Def.'s Ex. 12, ECF No. 12-1. On December 17, 2014, the EEOC issued Ms. Huckstep a right-to-sue letter. Def.'s Mot. Summ. J. 2.

On March 13, 2015, Ms. Huckstep filed this action alleging a single count of gender discrimination in violation of Title VII of the Civil Rights Act.[6] *See* Compl. ¶¶ 20–25. WMATA now moves for summary judgment, *see generally* Def.'s Mot. Summ. J., which Ms. Huckstep opposes, *see generally* Pl.'s Opp'n to Def.'s Mot. Summ. J., ECF No. 10 [hereinafter "Pl.'s Opp'n"].

## III.  ANALYSIS

### A.  Legal Standards

### 1.  Summary Judgment

A court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

---

[6] In her complaint, Ms. Huckstep initially brought claims under both Title VII and the D.C. Human Rights Act. *See* Compl. ¶¶ 20–29. On April 14, 2015, Ms. Huckstep voluntarily dismissed the D.C. Human Rights Act Count. *See* Voluntary Dismissal of Count II at 1, ECF No. 3.

The principal purpose of summary judgment is to streamline litigation by disposing of factually unsupported claims or defenses and determining whether there is a genuine need for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See Celotex*, 477 U.S. at 324. The non-movant "may not rest upon mere allegations or denials" but must instead present affirmative evidence. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (citing *Anderson*, 477 U.S. at 257).

In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence," *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant, *see Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## 2.  Title VII

Under Title VII, it is unlawful for an employer to "discharge any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In this circuit, two key cases outline the framework for Title VII discrimination cases: *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Brady v. Office of Sergeant at Arms*, 520 F.3d 490 (D.C. Cir. 2008). The three-part *McDonnell Douglas* burden-shifting framework applies when a Title VII plaintiff offers only indirect evidence of discrimination at summary judgment. *See Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003) (applying *McDonnell Douglas* to Title

VII claims). Under the framework, the plaintiff has the initial burden of production to establish a prima facie case of discrimination. If she does so, then the employer must articulate a legitimate, non-discriminatory reason for its action. *See McDonnell Douglas*, 411 U.S. at 802–05. If the employer does, then the plaintiff must produce evidence showing that the employer's stated reason was pretext for discrimination. *Id*. Although *McDonnell Douglas* shifts the burden of production between the parties, the plaintiff retains the ultimate burden of persuasion. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–508 (1993).

In the D.C. Circuit, *Brady* instructs that the *McDonnell Douglas* framework should be modified when the plaintiff suffered an "adverse employment action" and her employer has asserted a "legitimate, non-discriminatory reason" for the alleged discrimination. *See Brady*, 520 F.3d at 494. In such a case, *Brady* directs the Court to forgo *McDonnell Douglas* and instead resolve one "central question": whether "the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of . . . sex." *Id*. To answer this question, the Court must examine the totality of the evidence and determine whether "the jury could infer discrimination from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer." *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1114 (D.C. Cir. 2016) (quoting *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998)).

A plaintiff can attempt to show pretext by several means. For example, a plaintiff can highlight the "employer's better treatment of similarly situated employees outside the plaintiff's

protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, . . . the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015) (citing *Brady*, 520 F.3d at 495 & n.3). "Probably the most commonly employed method" to establish pretext, however, is to show that "similarly situated persons of a different . . . sex received more favorable treatment." 1 Lex K. Larson, *Employment Discrimination* § 8.04, at 8–66 (2d ed. 2007). For a plaintiff to prove that another employee is similarly situated, she must demonstrate that she and the similarly-situated employees were "charged with offenses of comparable seriousness" and that "all of the relevant aspects of [her] employment situation were nearly identical to those of the other employees." *Wheeler*, 812 F.3d at 1116 (quoting *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015)). To evaluate the similarity of the employment situations, courts consider several factors, including the "similarity of the plaintiff's and the putative comparator's jobs and job duties, whether they were disciplined by the same supervisor, and . . . the similarity of their offenses." *Burley*, 801 F.3d at 301.

## B. Application

Ms. Huckstep acknowledges that she lacks direct evidence of gender discrimination, Sandra Huckstep Dep. at 27:16–28:4, Def.'s Ex. 13, ECF No. 12-2. Because Ms. Huckstep was subjected to an adverse employment action (termination) and WMATA has asserted a legitimate, non-discriminatory reason for the action (Ms. Huckstep was involved in a Preventable–Major accident during her probationary period meriting dismissal), however, *Brady* applies. *See* Def.'s Mot. Summ. J. at 7–8 (conceding that termination of Ms. Huckstep was an adverse employment action); Def.'s Resp. Pl.'s Opp'n Def.'s Mot. Summ. J. at 2, ECF No. 11 [hereinafter "Def.'s

Resp."] (asserting that Ms. Huckstep was fired for her violation of three SOPs). Thus, the

Court turns to the central question identified in *Brady*: determining whether Ms. Huckstep has

produced sufficient evidence for a reasonable jury to find that WMATA's "asserted non-discriminatory

reason was not the actual reason and that the employer intentionally discriminated against the

employee on the basis of . . . sex." *Brady*, 520 F.3d at 494.

WMATA argues that Ms. Huckstep has not met this burden, and that it is entitled to

summary judgment for two reasons. First, WMATA argues that Ms. Huckstep's allegations of

gender discrimination are based on a rule that does not exist: a rule that "any accident incurred

by a bus operator during their probation result[s] in an automatic termination." Def.'s Mot.

Summ. J. at 10; Def.'s Resp. at 1–2. Second, WMATA states that, even if there was such a rule,

the putative comparators that Ms. Huckstep offers are inapt because their supervisors are

different or their conduct is not sufficiently similar to Ms. Huckstep's. Def.'s Mot. Summ. J. at

10–11; Def.'s Resp. at 2–5. The Court considers each argument in turn.

### 1.  Rules Regarding Termination During the Probationary Period

WMATA argues that Ms. Huckstep's allegations of gender discrimination "fall apart"

because she relies on a "mistaken belief[]" that any driver involved in an accident during his or

her probationary period is automatically terminated. *See* Def.'s Mot. Summ. J. at 10. Although

the Court finds that there is no genuine dispute of material fact regarding the absence of any such

rule, the Court does not believe that it is necessarily fatal to Ms. Huckstep's Title VII claim.

Ms. Huckstep's complaint alleged that WMATA has a policy that during the

probationary period, "any accident may result in immediate termination." Compl. ¶ 9. Ms.

Huckstep asserted that WMATA terminated her employment for "the stated reason of being in an

accident during the probationary period," *id.* ¶ 13, but that four other men from her training class were involved in accidents during this period and were not terminated. *See id.* ¶ 16.

WMATA argues that no such policy existed. *See* Def.'s Mot. Summ. J. at 10. Indeed, it appears that Ms. Huckstep has abandoned this argument. Her opposition to WMATA's motion for summary judgment concedes that "WMATA states that it does not have a specific policy that requires discharge for having an accident during the Probationary Period," and does not expressly dispute that understanding. Pl.'s Opp'n at 1. And although her response to WMATA's statement of material facts does not explicitly concede paragraph seven of WMATA's statement of material facts—which asserts that "[t]here is no rule that a bus operator is automatically terminated for having any accident within the 90 day probationary period," Def.'s SOMF ¶ 7—her own statement of facts fails to dispute that fact, *see generally* Pl.'s LGI (making no mention of that fact); *see also* D.D.C. Local Civ. R. 7(h)(1) ("[T]he Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.").

To the extent she does continue to rely on this factual assertion, however, Ms. Huckstep fails to point to any admissible evidence, or material that could be converted into admissible evidence, to support that claim. She produces no affidavits or deposition testimony claiming that the policy exists. In fact, all of the evidence in the record supports WMATA's position that the policy is discretionary. For example, Delores Proctor, WMATA's Service Director of Bus Transportation, submitted an affidavit to the Court stating unequivocally that such a policy did not exist "at all times relevant." *See* Proctor Aff. ¶ 6. Additionally, WMATA's Disciplinary Policy for Preventable Accidents, which specifies "minimum [disciplinary] actions to be taken" in the event of a preventable accident, specifies that drivers may be given merely a written

warning, three days' suspension, and one day of paid training for the first Preventable–Major

accident. *See* Disciplinary Policy at 2. Dismissal is only mandatory after a driver's third

Preventable–Major accident or the fourth Preventable–Minor accident. *See id.* Finally, the

Department of Bus Services Employee's Handbook states that "more serious [offenses] *may*

result in suspension or even dismissal upon the first offense." *See* Employee's Handbook at 3.

Each piece of evidence that WMATA supplies suggests that WMATA *may* dismiss drivers for

certain types of accidents during the probationary period, but does not *need* to dismiss the

drivers. *See* WMATA Probationary Period Policy ("The Authority may, at its own discretion,

discipline or discharge any new employee during a probationary period . . . ."); Disciplinary

Policy at 2 ("This policy indicates the minimum actions to be taken and does not restrict a

Superintendent from taking more severe action based on specific circumstances."). Thus, by

itself, Ms. Huckstep's statement that WMATA had an automatic termination policy for accidents

in the probationary period cannot defeat summary judgment. And, as the facts of this case

indicate, WMATA acted consistently with its discretionary policy—some drivers who were

involved in accidents during their probationary period were terminated, while others were not.

Accordingly, because there was no categorical policy in place requiring the termination

of an employee if an accident occurred during his or her 90-day probationary period, the Court

cannot find pretext simply on the basis that Ms. Huckstep was terminated for being involved in

an accident during her probationary period while some male drivers were not.

### 2.  Ms. Huckstep's Comparator Evidence

However, despite WMATA's contention to the contrary, the lack of a genuine dispute

about the probationary period dismissal policy is not fatal to Ms. Huckstep's Title VII claim. Ms.

Huckstep alleges that WMATA treated her differently than similarly situated male bus drivers.

*See* Compl. ¶ 22. Even if there is no policy that WMATA bus drivers are *automatically* dismissed for an accident in their probationary period, Ms. Huckstep can attempt to show that similarly situated male bus drivers received more favorable disciplinary treatment. If she is successful, that would create an inference that WMATA's proffered reason for her dismissal was pretextual. *See Walker*, 798 F.3d at 1092.

Ms. Huckstep argues that WMATA treated similarly situated male bus drivers more favorably by not terminating them after similar accidents during their probationary period. The Court evaluates each of Ms. Huckstep's proposed comparators, grouping them based on similar characteristics, and ultimately concludes that none of them are apt comparators. Thus, WMATA's treatment of those individuals cannot support an inference that WMATA's justification for Ms. Huckstep's termination was pretext for gender discrimination.

### a.  Jordan Butler and Marc Farmer

Ms. Huckstep alleges that Jordan Butler and Marc Farmer were similarly situated male bus drivers who received more favorable treatment. She asserts that their examples demonstrate that WMATA's proffered reason for her termination is pretext because Mr. Butler and Mr. Farmer, unlike Ms. Huckstep, were not terminated after being involved in accidents during their probationary periods. *See* Compl. ¶ 16; *see also* Pl.'s Opp'n at 5; Pl.'s LGI ¶ 6.

Neither Mr. Butler nor Mr. Farmer are proper comparators, however. To evaluate if a person is similarly situated to the plaintiff, and can thus serve as an appropriate comparator, a court asks if "all of the relevant aspects of [the person's] employment situation were nearly identical" to the plaintiff's. *See Wheeler*, 812 F.3d at 1116 (quoting *Burley*, 801 F.3d at 301). The court considers factors including the "similarity of the plaintiff's and the putative

comparator's jobs and job duties, whether they were disciplined by the same supervisor, and . . . the similarity of their offenses." *Burley*, 801 F.3d at 301.

Because they were not assigned to the same bus division, Mr. Butler, Mr. Farmer, and Ms. Huckstep did not share a common supervisor who evaluated their accidents. WMATA assigned Ms. Huckstep to the Four Mile Run Bus Garage immediately after hiring her. Def.'s SOMF ¶ 4. Mr. Butler, however, was assigned to the Bladensburg Bus Division, *id.* ¶ 21, and Mr. Farmer was assigned to the Montgomery Bus Division, *id.* ¶ 22. Accordingly, each of the drivers had a different supervisor that initially evaluated their accidents. Jeffrey L. Thompson, a bus division manager, compiled Ms. Huckstep's accident report. *See* Huckstep Acc. Rep. at 1, 11; Mem. of Dismissal at 1. But because Ms. Huckstep's accident was rated Preventable–Major, Mr. Thompson referred it to Assistant Superintendent George Sheppard for further evaluation. *See* Huckstep Acc. Rep. at 1. Superintendent Sheppard made the determination to terminate Ms. Huckstep's employment. *See* Mem. of Dismissal at 1–3.

By contrast, Sharon James, a service manager, evaluated Mr. Butler's accident and Mr. Ammons, an operations supervisor at the Montgomery Bus Division, investigated Mr. Farmer's accident. *See* Butler Acc. Rep. at 1; Farmer Acc. Rep. at 1. Because both of their accidents were rated Preventable–Minor, they were not subject to discipline by another superior. *See* Butler Acc. Rep. at 1; Farmer Acc. Rep. at 1. Thus, their reports were not referred to a superintendent or other authority, and were not before Superintendent Sheppard, who decided to terminate Ms. Huckstep. Because Mr. Butler and Mr. Farmer were not disciplined by the same supervisor as Ms. Huckstep, they cannot serve as appropriate comparators. *See Burley*, 801 F.3d at 301–02.

Additionally, even if Ms. Huckstep could show that Mr. Butler and Mr. Farmer were disciplined by the same supervisor, they are still not appropriate comparators because neither Mr.

Butler nor Mr. Farmer was involved in an accident "of comparable seriousness" to Ms.

Huckstep's accident. *Wheeler*, 812 F.3d at 1116 (quoting *Burley*, 801 F.3d at 301). Both Mr.

Butler's and Mr. Famer's accidents involved low speeds. Each resulted in only minor property

damage. And in neither accident were injuries reported. For example, in Mr. Farmer's case, the

only property damage was torn sod in the front yard of a residence as he made a U-turn at low

speeds. *See* Farmer Acc. Rep. at 2. For these reasons, WMATA rated both of their accidents as

only Preventable–Minor.

In contrast, Ms. Huckstep's accident involved concerns about her speed, including

improper acceleration through an intersection when the light turned yellow despite adequate time

to safely bring the bus to a stop. Ms. Huckstep's accident resulted in moderate damage to another

vehicle, including deployed airbags and a bent frame. The driver of the other vehicle reported

stomach and back pain after the incident. In accordance with WMATA's Guide to Determining

Preventable Accidents, Ms. Huckstep's accident was rated Preventable–Major. *See* Mem. of

Dismissal at 1. Thus, the accidents of Mr. Butler and Mr. Farmer do not "carr[y] [the] enhanced

culpability" of Ms. Huckstep's accident. *See Burley*, 801 F.3d at 302 (finding that a train

accident that involved a derailment was not similar to other accidents that did not involve

derailments). Accordingly, they were not "charged with offenses of comparable seriousness" and

cannot serve as comparators. *Wheeler*, 812 F.3d at 1115 (quoting *Burley*, 801 F.3d at 301).

Ms. Huckstep's only response to WMATA's argument is that evaluation of a proper

comparator is "ordinarily a question of fact for the jury," and should thus preclude summary

judgment. Pl.'s Opp'n at 6. While a court is required to construe the evidence in favor of the

non-movant, *see Anderson*, 477 U.S. at 255, if a reasonable jury could not find that the putative

comparator and plaintiff are similarly situated, the court can decide, as a matter of law, that the

two are not similarly situated, *George v. Leavitt*, 407 F.3d 405, 414–15 (D.C. Cir. 2005); *see also*

*Kassim v. Inter-Continental Hotels Corp.*, 997 F. Supp. 2d 56, 65 (D.D.C. 2013) (finding that a

putative comparator was improper as a matter of law because the plaintiff was "primarily"

disciplined by a different superior than the comparator). Thus, the Court finds as a matter of law

that no reasonable juror could find that Mr. Butler and Mr. Farmer are proper comparators.

### b.  *Michael Coates and Dan Davis*

Ms. Huckstep also alleges that Michael Coates and Dan Davis are similarly situated male

bus drivers who were not terminated after an accident during their probationary period. *See*

Compl. ¶ 16; *see also* Pl.'s Opp'n at 5; Pl.'s LGI ¶ 6. Unlike Mr. Butler and Mr. Farmer, Mr.

Coates and Mr. Davis were both assigned to the Four Mile Run Bus Garage with Ms. Huckstep

during their probationary periods. *See* Def.'s SOMF ¶¶ 18, 19. After Mr. Coates's accident

during his probationary period, Mr. Thompson compiled the accident report, as he did for Ms.

Huckstep following her accident. *See* Coates Acc. Rep. at 1. After Mr. Davis's accident, Letroy

Baker, a Bus Service Operations Manager, compiled the accident report and recommended a

written reprimand. *See* Davis Acc. Rep. at 1. Because neither Mr. Coates nor Mr. Davis were

referred to other WMATA officials for further investigation, their disciplinary evaluations ended.

*Compare* Coates Acc. Rep. at 1 (listing a disciplinary action without a referral in row 16), *and*

Davis Acc. Rep. at 1 (same), *with* Huckstep Acc. Rep. at 1 (listing "Referred to Asst. Supt.").

Therefore, there is some question whether a jury could conclude that they were disciplined by the

same supervisor, even though they were based out of the same garage as Ms. Huckstep.

But even assuming that they could count as proper comparators on that ground, neither

Mr. Coates nor Mr. Davis had an accident comparable in seriousness to Ms. Huckstep's own.

Mr. Coates backed into and knocked over a light pole, causing only minor damage to his bus,

while Mr. Davis merely made contact with the mirror of a Circulator Bus. *See* Coates Acc. Rep. at 2; Davis Acc. Rep. at 2. Like the accidents of Mr. Butler and Mr. Farmer, neither involved injuries to people or concerns about speed, and both were ultimately rated Preventable–Minor. *See generally* Guide to Preventable Acc. Ms. Huckstep's accident, as previously discussed, involved concerns about speed, caused moderate damage to another vehicle, and caused reported injuries to the driver of the other vehicle. WMATA thus rated her accident Preventable–Major. *See* Mem. of Dismissal 1. As such, Mr. Coates and Mr. Davis were not "charged with offenses of comparable seriousness" and cannot serve as comparators for Ms. Huckstep. *See Wheeler*, 812 F.3d at 1115–16 (quoting *Burley*, 801 F.3d at 301); *see also Wilson v. Wash. Metro. Area Transit Auth.*, 631 F. Supp. 2d 58, 68 (D.D.C. 2009) (eliminating a putative comparator, who was charged with failure to safeguard prisoner property, because her infraction was "significantly less serious" than the plaintiff's, which involved crashing a police car into a residence); *Williams v. Chertoff*, 495 F. Supp. 2d 17, 33–34 (D.D.C. 2007) (finding a comparator inapt because his "inappropriate conduct while on duty" and the plaintiff's "alleged off-duty physical assaults" were not of comparable seriousness).[7]

### c.  *Shakita Bowlding*[8]

Finally, Ms. Huckstep alleges that WMATA terminated another female bus driver, Shakita Bowlding, following an accident during her 90-day probationary period, just as it terminated Ms. Huckstep and unlike its actions with respect to the four male bus drivers. *See*

---

[7] In her opposition to WMATA's motion for summary judgment, Ms. Huckstep makes no real effort to compare the seriousness of her accident to that of the four male drivers. The Court will not raise arguments on her behalf, depriving WMATA of an opportunity to reply.

[8] Ms. Huckstep refers to Ms. Bowlding as "Shakita Bolden," "Shakita Bowlding," and "Shakita Bowlwing." *See, e.g.*, Compl. ¶ 15; Pl.'s Opp'n at 1; Pl.'s LGI ¶ 4. The Court uses the name listed on WMATA's bus operator chart to refer to Ms. Bowlding. *See* Student Bus Operator Chart at 1.

Compl. ¶ 15; *see also* Pl.'s Opp'n at 1; Pl.'s LGI ¶ 4. Ms. Huckstep contends that Ms. Bowlding's termination is evidence that WMATA discriminates against female bus drivers by subjecting them to harsher treatment than similarly situated male bus drivers. *See* Pl.'s Answers Interrog. at 2, ECF No. 10–2.

The Court notes that Ms. Bowlding cannot serve as a comparator for Ms. Huckstep. A comparator offered to show an "employer's better treatment of similarly situated employees" must be "*outside the plaintiff's protected group*." *Walker*, 798 F.3d at 1092 (emphasis added). Because Ms. Huckstep asserts that she was a victim of discrimination due to her sex, any comparators must be non-female. Thus, Ms. Bowlding clearly does not qualify as a valid comparator. Nevertheless, an employee may attempt to establish pretext through another route. She can offer evidence that her employer has a "pattern of poor treatment of other employees in the same protected group as the plaintiff." *Id.* Ms. Huckstep does not specifically make this argument, although she does refer to Ms. Bowlding in passing as another female driver who suffered termination as a consequence of an accident during the probationary period. *See* Compl. ¶ 15; Pl.'s Opp'n at 1, 5.

But assuming that Ms. Huckstep mentions Ms. Bowlding in an attempt to establish a pattern of poor treatment of female bus drivers, the Court finds that evidence insufficient. Ms. Huckstep has not met her burden to show that the termination of Ms. Bowlding constituted poor treatment or was due to anything other than her having an accident during the probationary period.[9] She provides absolutely no evidence concerning the circumstances of Ms. Bowlding's accident or her termination, and thus a reasonable jury would be unable to assess whether

---

[9] The Court assumes *arguendo* that Ms. Bowlding had an accident during her probationary period, although Ms. Huckstep has not produced evidence to this effect aside from her response to an interrogatory. *See* Pl.'s Answers Interrog. at 2.

WMATA treated Ms. Bowlding differently than her male counterparts, or even similarly to Ms. Huckstep. Because she fails to provide affirmative evidence from which the jury could compare Ms. Bowlding's accident to both Ms. Huckstep's and that of her putative comparators, there is insufficient evidence for a jury to find that WMATA had a pattern of treating female employees differently than male employees.[10]

## IV.  CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (ECF No. 9) is **GRANTED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: October 24, 2016                                         RUDOLPH CONTRERAS
                                                                United States District Judge

---

[10] Notably, Ms. Huckstep does not claim that she was unable to obtain any relevant evidence concerning Ms. Bowlding's termination or her accident during discovery. *See generally* Pl.'s Opp'n.